Filed 2/24/21; certified for publication 3/2/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| In re I.R., a Person Coming Under the Juvenile Court Law. | B307093 |
|---|---|
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP03478) |
|     Plaintiff and Respondent, | |
|     v. | |
| E.R., | |
|     Defendant and Appellant; | |
| I.R., | |
|     Appellant. | |

      APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore. Affirmed in part and reversed in part.

      Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant E.R.

Karen B. Stalter, under appointment by the Court of Appeal, for Appellant I.R., a Minor.

Rodrigo A. Castro-Silva, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Jane Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

—————————————————

Following an incident of domestic violence between R.R. (Mother) and E.R. (Father) witnessed by their infant daughter, I.R., and Mother's son, D.R., the Los Angeles County Department of Children and Family Services (DCFS) instigated dependency proceedings on behalf of both children. After a combined jurisdictional and dispositional hearing, the juvenile court found jurisdiction over the children under Welfare and Institutions Code[1] section 300, subdivision (b)(1), and ordered I.R. removed from Father and released to Mother. On appeal, both Father and I.R. challenge the removal of I.R. from Father. We conclude the evidence does not support either of the findings necessary to justify removal under section 361, subdivision (c)(1). Specifically, the record does not contain substantial evidence that I.R. would be in "substantial danger" in Father's care, nor does it contain substantial evidence that there were no "reasonable means" to protect I.R. other than removing her from Father. (§ 361, subd. (c)(1).)

I.R. further challenges the dispositional order to the extent it requires Mother, who is not a party to this appeal, to submit to drug testing only upon reasonable suspicion of drug use. Given the lack of any connection between drug use and the domestic

---

[1] All subsequent unspecified statutory references are to the Welfare and Institutions Code.

violence underlying the petition, we conclude the court was acting within its discretion in denying I.R.'s request that Mother submit to more extensive drug testing.

Accordingly, we reverse the dispositional order to the extent it removes I.R. from Father.

## FACTS AND PROCEEDINGS BELOW

### A. *Family Circumstances and Incident Leading to Juvenile Court Jurisdiction*

I.R., born in September 2018, is the daughter of Father and Mother. Mother is not a party to this appeal. I.R. has a maternal half sibling, D.R., born in November 2008, Mother's son from a previous relationship.[2] Prior to the instant dependency proceedings, Father either lived in the family home with Mother, D.R., I.R., and the maternal grandmother, or was a frequent overnight guest there.[3]

On May 9, 2020, Mother called law enforcement and reported a domestic violence incident with Father. I.R. and D.R.—then 20 months old and 11 years old, respectively—were in the home when Mother and Father got into a loud argument. Hearing the yelling, D.R. left his room and saw Father throw a baby shoe at Mother's chest and slap one side of her face. Father hit Mother with enough force to knock her earring off her ear, causing redness and swelling on the side of her face. Father fled the home before law enforcement arrived.

---

[2] The whereabouts of D.R.'s father are unknown, and he did not participate in the dependency proceedings below.

[3] The record contains inconsistent statements by Mother and Father as to whether Father ever lived in the family home.

Law enforcement instigated a referral with DCFS based on the incident and on Mother's statement the night of the incident that Father had physically assaulted her approximately eight months earlier as well. The children remained in the family home in Mother and the maternal grandmother's care.

### B. Pre-Petition Investigation and Efforts to Locate Father

Approximately two weeks later, social workers visited the children's home and interviewed Mother. At that time, Mother told DCFS that "more [was] being made out of this than needs to be." Mother stated that she had anger management issues, and that Father had slapped her only after she "said 'something terrible' " to him. Mother said the previously unreported domestic violence incident eight months prior had not been physical, and that the more recent incident was the first time Father had hit her. Social workers interviewed D.R. as well. D.R. said that Father is "not nice" to Mother, that Mother and Father yell a lot, and that another time in the past Father told him to go into his room with I.R. and shut the door, after which D.R. heard a loud slap. D.R. stated he was scared by both incidents, but that he felt safe around Father and in his home. D.R. also stated that Father was nice to him and his sister, and that Father had never mistreated either of them.

Neither child showed any signs of abuse or neglect, and I.R. appeared healthy and developmentally on target. D.R. reported that he is receiving individual therapy for anger management issues because "sometimes he gets so angry that he just wants to yell or hit something." D.R.'s mental health issues were the subject of a previous DCFS referral. The social worker who handled that referral indicated D.R.'s aggressive behavior was in

response to being bullied at school, and that Mother had addressed these issues appropriately and enrolled him in counseling.

Both Mother and D.R. reported to social workers that Father had come to visit I.R. almost every day since leaving the home the night of the May 9 incident, and that he played with D.R. during these visits as well. D.R. stated that Father spoke with Mother during these visits, and that the two did not fight. Mother denied being home when Father came for visits.

DCFS learned that neither Mother nor Father had any criminal history. Mother had a number inconclusive prior child welfare referrals with regard to physical abuse and neglect, primarily involving D.R. For example, a referral from December 2015 alleged that Mother hit D.R. with the metal portion of a belt; another referral from February 27, 2019 (by the maternal grandmother) alleged that Mother had been using drugs. Father had no history of child welfare referrals.

DCFS was unable to make contact with Father during its pre-petition investigation despite numerous attempts. The social worker called Father several times and left detailed messages with call-back requests, mailed an "[a]ttempt to [c]ontact" letter to Father at the paternal grandmother's address, visited the paternal grandfather's home where the paternal grandfather indicated Father was living, and asked the paternal grandfather to instruct Father to contact DCFS. At DCFS's request, Mother also gave Father the social worker's card and asked he contact DCFS. Father did not contact DCFS in response to any of these efforts.

On June 25, 2020, DCFS obtained a removal warrant, which effectively prohibited Father from having contact with

5

I.R. before further proceedings. DCFS informed Father of the removal warrant via a detailed phone message (which also requested a call back) and by mailing him a copy of the removal order and notice of hearing. According to the maternal grandmother, Father stopped visiting I.R. after the removal warrant issued.

### C. *Section 300 Petition and Detention Hearing*

On June 29, 2020, DCFS filed a petition pursuant to section 300, subdivisions (a) and (b)(1), alleging that Mother and Father have a history of engaging in violent verbal and physical altercations, including specifically the May 9, 2020 incident, and that Mother failed to protect the children by allowing Father unlimited access to the children and their home.

The detention hearing took place on July 2, 2020. Father personally participated in the hearing, which participation constituted his first interaction with DCFS. In the detention report provided to the juvenile court that day, DCFS recommended I.R. continue to be detained from Father and remain in the Mother's care during a period of family reunification efforts. The report identified risk factors requiring detention that implicated both Mother and Father, but also described Mother as having a "history of protective capacity for her children and [as] ha[ving] addressed DCFS concerns in a positive way during past referral investigations." It further noted that Mother took responsibility for her role in the domestic violence. The report viewed Father's avoidance of DCFS and law enforcement as demonstrating an unwillingness to take responsibility for his role in the domestic violence. DCFS was also concerned about the effects of the domestic violence on D.R., who struggled with his own anger management issues.

6

The juvenile court found Father to be I.R.'s presumed father, found prima facie evidence that I.R. was a child described by section 300, and denied Father's request for I.R.'s release to his custody. I.R. was detained from Father and released to Mother's custody, with Father to receive six hours per week of monitored visitation. No visits were to occur in the Mother's home, Mother was prohibited from monitoring the visits, and DCFS had discretion to liberalize.

## D. *Jurisdiction and Disposition Hearing*

At the July 29, 2020 combined jurisdiction and disposition hearing, the juvenile court received into evidence DCFS's detention and jurisdiction/disposition reports, as well as a letter verifying Father had enrolled in a 36-week domestic violence education course on July 13, 2020, 11 days after the detention hearing.

### 1. The jurisdiction/disposition report

The jurisdiction/disposition report described interviews with Father and the maternal grandmother, as well as additional interviews with D.R. and Mother.

#### a. *Father's statements*

The report contained Father's description of the May 9 incident. He recalled Mother "got loud," and that he ignored her and tried to grab I.R. and walk away, but Mother already had the child. Father then started to walk outside, when Mother pushed him, and "it just happened. I just flipped." Father acknowledged slapping Mother but denied throwing a shoe at her. Father stated Mother is easily triggered and starts screaming, but that he is a very calm person and that "walking

7

away" had "always worked" in the past. He denied any prior domestic violence incidents with Mother and stated he felt "really bad" about the situation. He said, "[i]t was only a one-time thing. I don't get aggravated. I'm not a bad parent to my daughter. I have never been a threat." Father stated he no longer has a relationship with Mother, because he does not "want that to happen again," and wants to "focus on [I.R.]" Father provides financially for I.R., and buys her food and clothes whenever needed.

The report reflected Father had been visiting I.R. consistently, five days per week, for two and one-half hours per visit, without incident. It further acknowledged that, although Father had avoided contact with DCFS during the detention investigation, he had since been cooperative with the DCFS dependency investigator and was open to receiving services.

### b. *Mother's statements*

Mother stated that she and Father fought "a lot," and that during the May 9 incident she had "us[ed] ugly cuss words towards [Father]" and pushed him. Consistent with Father's statements, she described him as a person who avoided conflict and did not often yell.

Mother stated Father was a great father and confirmed he provided financially for I.R. Mother stated she knew what Father did was wrong, but she did not consider their relationship to be one involving domestic violence. Mother said she had exaggerated the May 9 incident to the police because she was upset, and that "[i]t was fine the way it was before." Mother said she was not currently in a relationship with Father. She acknowledged her prior DCFS referrals, but said they were all false allegations.

Regarding her substance use, Mother said she had started using methamphetamine at age 17 and used it "all day, every day" until she became pregnant with D.R. at 22 years old, at which time she quit "cold turkey." She said she now smoked marijuana after the children were asleep at night. Mother had not enrolled in any programs, but stated she was open to doing so.

Mother reported that, during the period in her life when she was heavily using methamphetamine, she had been a victim of domestic violence at the hands of D.R.'s father. On one occasion (in approximately 2008), D.R.'s father physically assaulted her while she was pregnant with D.R., beating her so severely that it resulted in a cracked skull and black eyes.

### c. *The maternal grandmother's statements*

The maternal grandmother said she never witnessed the domestic violence between Mother and Father, but that D.R. had told her "a while back" that "he saw [F]ather hit [M]other before and push her, and that this happened a few times." She was scared of Father because he was always terse, rude to her, and she believed his family members were gang affiliated.

### d. *D.R.'s statements*

D.R. told DCFS he felt safe with Mother, but that she was easily triggered and yelled a lot. D.R. described Father as "the best," because Father never hit, yelled, or argued with him. D.R. began crying when he told the social worker that he never had contact with his biological father, that this "really hurts his feelings," and that he was worried about losing Father as well. D.R. reported that he continued to have difficulty managing his anger and controlling his violent reactions to severe bullying at

school.  He remained in individual therapy to address these issues.

## 2. *Parties' arguments and the juvenile court's ruling*

At the jurisdictional portion of the hearing, the juvenile court sustained the section 300, subdivision (b)(1) failure to protect count in the petition as to both parents,[4] based on their failure to make progress in addressing the domestic violence leading to dependency jurisdiction.

At the disposition portion of the hearing, I.R.'s counsel argued that clear and convincing evidence did not support removal from Father.  I.R.'s counsel specifically argued that "the safety plan to allow [I.R.] to remain in Father's custody is that the father and the mother are not to be together," something they had been doing since the removal warrant issued.  Counsel noted that two paternal relatives had been approved as monitors, and they could facilitate Mother and Father avoiding contact with one another while transferring I.R.  I.R.'s counsel further argued that the evidence did not suggest Father was violent by nature, and that, despite his initial evasion of DCFS, he was now cooperating with DCFS and had enrolled in a domestic violence course.  I.R.'s counsel also asked that, because of Mother's substance use and I.R.'s young age, Mother be ordered to present three consecutive clean drug tests to assure I.R. was safe in her care.  Counsel noted that even without a sustained drug count in the petition, Mother had a history of drug use that could contribute to domestic violence issues.

---

[4] The court dismissed the section 300, subdivision (a) count alleging risk of nonaccidental physical harm.

10

Father's counsel reiterated the arguments made by I.R.'s counsel in requesting I.R. be placed with him. Counsel further argued that Father had "acknowledged the situation" and "moved out of the house," that Mother and Father now had a good coparenting relationship and did not argue, and that it would be in I.R.'s best interests to be placed with Father.

Mother joined Father and I.R.'s requests that I.R. not be removed from Father, noting Father "is a good father to not only [I.R.] but also to [D.R.]" Mother objected to any drug testing, given the lack of any nexus between drug use and the allegations in the petition, and that "there's no indication [Mother] currently uses."

DCFS's counsel argued that I.R. should remain removed from Father, noting the multiple prior referrals "on this family" (although none of these involved Father and most predated his involvement with the family by several years), that "Mother and Father really can't stay away from each other," and that neither had addressed the underlying domestic violence issues, something Father's recent enrollment in a program could not alone achieve. Counsel explained DCFS was only comfortable permitting I.R. to remain with Mother "because of the safeguards that were put in place." Counsel suggested unmonitored visits for Father in a neutral setting as a compromise.

The juvenile court agreed with DCFS counsel that Father enrolling "very late" in domestic violence training and the "numerous referrals" indicated Father had not addressed the underlying domestic violence issues to the extent that the court would feel comfortable releasing the child to him. The court found by clear and convincing evidence that it was reasonable and necessary to remove I.R. from Father, because there existed

11

a substantial danger to I.R. if it did not do so, and there was "no reasonable means by which the child's physical health can be protected without removing the child from . . . Father."

The court ordered I.R. be removed from Father and released to Mother under a home-of-parent-mother order, explaining that "the reason why the child is being placed with . . . Mother is because she is demonstrating that she is cooperating with [DCFS] and availing herself of the services and showing that she is developing that protective capacity." The juvenile court ordered services for both parents. The court noted that it "appreciate[d] that [Father's] a very devoted father, and that he has been staying away from . . . Mother," and for that reason ordered unmonitored visits over DCFS objection. The court ordered the visits not occur in the family home and that Mother not be present. The court declined to order the drug testing I.R.'s counsel had requested, instead ordering "testing upon reasonable suspicion . . . only because the child is young. I don't think there's any evidence of any kind of present use that's concrete."

Both I.R. and Father timely appealed.

## DISCUSSION

Father and I.R. challenge the court's removal of I.R. from Father. They argue that the record supports neither the court's finding that I.R. would be in substantial danger in Father's custody, nor the finding that removing I.R. from Father's custody was the only reasonable means of protecting her. For the reasons set forth below, we agree.

We disagree, however, with I.R.'s additional argument that the trial court abused its discretion by refusing her request that Mother be ordered to submit to three consecutive drug tests.

12

**A.    *Substantial Evidence Does Not Support the Court's Removal Order***

"Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community.  Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures."  (*In re Henry V.* (2004) 119 Cal.App.4th 522, 530–531 (*Henry V.*).)

Accordingly, " '[i]n dependency proceedings[,] the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home' " or the physical custody of a parent.  (*Henry V., supra,* 119 Cal.App.4th at pp. 528–529.)  The applicable statute, section 361, subdivision (c), " 'is clear and specific:  Even though children may be dependents of the juvenile court, they shall not be removed . . . unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being *and* there are no "reasonable means" by which the child can be protected without removal.' "  (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809 (*Ashly F.*); § 361, subd. (c)(1) [requiring "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" and "no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody"].)

A finding of parental abuse cannot alone provide the clear and convincing evidence necessary to justify removing a child. (See *In re Kieshia E.* (1993) 6 Cal.4th 68, 77 ["Juvenile Court

13

Law restricts judicial power to remove a child from the care and society of even an abusive or abuse-tolerant parent"]; *Henry V., supra,* 119 Cal.App.4th at p. 531.) Rather, the juvenile court must determine whether a child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention. (See *In re Alexzander C.* (2017) 18 Cal.App.5th 438, 451–452; *In re N.M.* (2011) 197 Cal.App.4th 159, 170.)

"On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*Ashly F.*, *supra*, 225 Cal.App.4th at p. 809; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 ["when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof"].) " ' "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." [Citation.]' [Citation.]" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

The sole source of potential danger to I.R. while in Father's care that is supported in the record derives from his history of domestic violence with Mother, at least one instance of which was in I.R.'s presence. We recognize the serious threat domestic violence poses to a child's physical and emotional well-being.

14

Nevertheless, nothing in the record suggests Father has ever been violent or aggressive outside the context of his relationship with Mother, nor that he is a generally violent, aggressive, or abusive person. The nature and frequency of the domestic violence incidents—two instances in which Father slapped Mother, the second of which also involved him throwing a baby shoe at her—do not support a reasonable inference that he is a generally violent or abusive person.[5] The "numerous [DCFS] referrals in the past" that the court erroneously attributed to Father were against Mother only and had nothing to do with him; he has no DCFS history, no prior referrals, and no criminal record. The record thus contains only evidence suggesting danger to I.R. if the domestic violence between Mother and Father continues—not danger resulting from I.R. being in Father's care.

Whether substantial evidence supports the juvenile court's removal order thus depends on whether the record contains substantial evidence that the domestic violence between Mother and Father is likely to continue if I.R. is placed in Father's care. We conclude it does not. Father does not live in the family home. The juvenile court recognized that Father has "stay[ed] away from . . . Mother," and the record does not reflect any contact between Father and Mother since the court's orders at detention that Father not visit I.R. in the family home or in Mother's presence. Father has not even expressed a desire or willingness to reconcile with Mother. Mother has neither expressed nor demonstrated an unwillingness to keep her distance from Father. Nor does the record suggest that the logistics of sharing custody would require Father to have contact with Mother, given that

---

[5] By so concluding, we do not mean to condone slapping one's partner.

both parents live with relatives who have been approved as monitors and could assist with handing off the child. There is thus no basis on which the court could reasonably accept DCFS's argument that "Mother and Father really can't stay away from each other," meaning there is no basis for concluding there will be occasion for the domestic violence between them to continue. Given the lack of any other basis on which the court could conclude Father poses a danger to I.R., substantial evidence does not support a finding of such danger.[6] In so concluding, our substantial evidence review is informed by the heightened clear and convincing evidence standard below (see *Ashly F., supra,* 225 Cal.App.4th at p. 809), and the general premise of our dependency system that "keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests." (*Henry V., supra,* 119 Cal.App.4th at p. 530.)

## B. *The Court Did Not Abuse Its Discretion in Denying I.R.'s Request for More Extensive Drug Testing of Mother*

Section 362, subdivision (d) authorizes the juvenile court to "direct any reasonable orders to the parents" of a dependent child as the court deems necessary and proper to ensure appropriate care, supervision, custody, conduct, maintenance, and support

---

[6] In reaching this conclusion, we do not rely on I.R.'s and Father's arguments that the risk of danger to I.R. is comparatively higher when in Mother's care, as opposed to Father's. The propriety of the juvenile court's decision not to remove I.R. from Mother is not the subject of this appeal, and even if we were to assume it is true that Mother poses a danger to I.R., that is not a basis for concluding that Father does not.

16

of the child (§ 362, subd. (d)), and the juvenile court enjoys broad discretion in crafting a dispositional case plan to this end.  (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071.)  We review the juvenile court's disposition case plan for an abuse of discretion.  (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.)

The court did not act in excess of that discretion by declining to impose more onerous drug testing requirements on Mother.  In arguing to the contrary, I.R. points to evidence that Mother abused methamphetamines for several years and continues to use marijuana, that she has not participated in any drug treatment programs, and that she was using drugs while in a domestic violence relationship with another man over 10 years ago.  Although these facts could potentially have justified an order requiring more extensive drug testing for Mother, they do not establish that the court's refusal to issue such an order was arbitrary or capricious.  The record does not contain evidence supporting any link between any current drug use by Mother and the incidents of domestic violence with Father.  Nor does it indicate that Mother's drug use has ever placed her children at risk.  As such, the court acted well within its discretion in denying I.R.'s request for additional drug testing requirements.

## DISPOSITION

The dispositional order of the juvenile court is reversed to to the extent it removes I.R. from Father.  Upon remand, the court shall issue a new order setting forth the terms and extent of Mother's and Father's shared custody and impose whatever additional restrictions or requirements the court deems reasonable and appropriate in order to assure the safety and well-being of I.R. while in Father's care.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


BENDIX, J.

Filed 3/2/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re I.R., a Person Coming Under the Juvenile Court Law. | B307093 |
| _____ | (Los Angeles County Super. Ct. No. 20CCJP03478) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | CERTIFICATION AND ORDER FOR PUBLICATION |
| v. | |
| E.R., | |
| Defendant and Appellant; | |
| I.R., | |
| Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on February 24, 2021 was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

ROTHSCHILD, P. J.        CHANEY, J.        BENDIX, J.